**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DAVID WAYNE SHAW, | § | |
| (TDCJ-CID #1304818) | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION H-07-2709 |
| | § | |
| ALFRED C. JANICEK, *et al.,* | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

David Wayne Shaw, an inmate in the Texas Department of Criminal Justice - Correctional

Institutions Division ("TDCJ-CID"), has sued prison officials, alleging that the defendants denied

him proper medical care, wrongfully denied his grievances, and conspired to violate his civil rights.

There are two categories of defendants: officers and employees of the TDCJ and employees of the

University of Texas Medical Branch at Galveston ("UTMB").

The TDCJ Defendants, Guy Smith, Kelli Ward, Alice James, Trisha Hollingsworth, Stephen

Allee, Richard Thomas, Sharon Johnson, David Franshaw, and Alfred Janicek, have moved for

summary judgment. (Docket Entry No. 176). Shaw has responded. (Docket Entry No. 195).

The UTMB Defendants, Betty J. Williams, William Shelby, Brenda Hough, Sandra Dickey,

Victoria Ray, Kerri Paradysz, Denise Box, Shanta Crawford, Anitra Manas, and Andrew DeYoung,

have also moved for summary judgment. (Docket Entry No. 174). Shaw has responded. (Docket

Entry No. 196). Another UTMB Defendant, Dr. Ankur Mehta, filed a separate motion for summary

judgment, (Docket Entry No. 175), to which Shaw responded, (Docket Entry No. 194).

Based on the pleadings, the motions, the summary judgment record, and the applicable law, this court grants the motions for summary judgment filed by the defendants. Final judgment is entered by separate order. The reasons for these rulings are stated below.

## I.   Background

### A.   The Allegations in the Complaint

Shaw alleges that at the trustee camp of the Ellis Unit of TDCJ, he was involved in a fist fight with another inmate on March 2, 2007. Shaw alleges that he hit the inmate in the head with a closed fist, crushing a knuckle and fracturing a bone in his right hand. (Docket Entry No. 7, Plaintiff's More Definite Statement, p. 9). An officer on duty, Sergeant Franshaw, sent both Shaw and the other inmate to prehearing detention to await disciplinary action.[1] (Docket Entry No. 1, Complaint, p. 7). During the preliminary investigation, the charging officer, M. Jenkins, told Sergeant Franshaw about Shaw's injuries. Sergeant Franshaw saw Shaw's injured hand, swollen cheek, and bloody nose. Sergeant Franshaw escorted Shaw to the infirmary.

Shaw got to the infirmary at approximately 5:30 p.m. The nurse on duty, Cheryl Loeffler, was busy with insulin patients. She told Sergeant Franshaw that he would have to wait until she finished giving out insulin before she could conduct a prehearing detention physical. According to Shaw, Sergeant Franshaw told the nurse that he did not have time to wait. The nurse replied that she was under orders from the Warden not to leave insulin supplies unsupervised. Sergeant Franshaw told the nurse that he had to leave. Shaw objected because his right hand was extremely painful, but Sergeant Franshaw took Shaw back to the pre-hearing detention wing. When Shaw

---

[1]   Shaw was charged with fighting without a weapon in Disciplinary Case Number 20070183481. Shaw pleaded guilty and was punished with a loss of commissary privileges for thirty days; cell restriction for thirty days; placement in solitary confinement for 15 days; and reduction in good-time earning class status from state-approved trusty ("SAT") 2 to SAT 4.

asked if he was going to receive any medical treatment for his hand, Sergeant Franshaw replied: "if you are lucky you'll be seen tomorrow."   Shaw was placed in a cell and his request for pain medication was denied.

On March 3, 2007, Shaw saw nurse Victoria[2] Ray pass by his cell.  Shaw called out to the nurse, who stopped.  Shaw showed the nurse his hand, which was very swollen and discolored.  The nurse said that she would note the injury and inform the proper authorities in the infirmary about Shaw's hand.  Shaw alleges that Nurse Ray did not follow TDCJ-CID Health Services Policy Manual and denied Shaw access to emergency medical care.

On March 9, after seven days, Shaw was taken to the infirmary.  His hand was x-rayed. Physician's Assistant William Shelby told Shaw that his right hand was broken.  Shelby then told the escort officers that Shaw was finished and could be returned to the lockup wing.  Shaw asked Shelby if he could have a splint put on his hand.  Shelby told him that a splint would not be used in this situation because of the security risk.  Shaw asked Shelby if there would be a referral to a bone specialist.  Shelby responded: "no, that stage is long passed," stating that specialized care should have been provided within the first seventy-two hours after the injury.  Shaw asked for pain medication.  The following day, March 10, 2007, Shaw received a two-week supply of ibuprofen. He alleges that this medicine provided little relief from the extreme pain in his right hand.

Shaw alleges that Cheryl Loeffler, an LVN in the Ellis Unit, falsely claimed to have provided a physical examination on March 9, 2007.  Shaw alleges that she had an opportunity to provide him with needed medical care and medication but did not do so.

---

[2]   Shaw refers to this nurse as "Victor Ray" but the summary judgment evidence shows that the correct name is "Victoria Ray."

Shaw also alleges that William Mills, H.R.N., refused him emergency medical care.  Shaw alleges that Mills made false entries into Shaw's medical records.

On March 12, 2007, x-rays were taken of Shaw's right hand.  Physician's Assistant Shelby again examined Shaw and confirmed that his hand was broken. Shelby told Shaw that he would be scheduled for a video conference with a specialist at UTMB Hospital in Galveston.

On March 16, 2007, the day before Shaw was to be released from solitary confinement, Nurse Brenda Hough medically "unassigned" him from any work requirements for ninety days.  On March 17, 2007, Shaw was released from solitary confinement.  Shaw asserts that Nurse Hough made a false entry in his medical records stating that she had examined Shaw before his release from solitary confinement.  Shaw alleges that as a result, his requests for medical care were denied.

On May 7, 2007, Shaw was again seen by Hough.  She examined his right hand and noted the disfigurement.  Hough extended his medical unassignment, gave him thirty more days of pain medication, and told him that he would have a video conference with an orthopedic surgeon.

Shaw alleges that on August 20, 2007, Nurse Hough violated his civil rights by reinstating his restriction-free medical status, without performing a physical examination.  As a result, Shaw had to perform work-related duties that he could not do because of the hand injury.

Shaw alleges that after he filed grievances alleging that he was denied medical treatment and medication, Assistant Warden Richard Thomas failed to investigate.  Shaw also alleges that the Warden of the Ellis I Unit was responsible for making and carrying out policies and practices that lead to the violation of Shaw's constitutional rights.

Shaw sued other supervisory officials as well.  He alleges that Shanta Crawford, the Health Care Administrator over the Ellis I Unit's medical department, is liable because she was responsible

for training medical personnel at the Unit.  Shaw also alleges that Crawford was informed of Shaw's medical needs and his complaints and failed to investigate.  Shaw alleges that Betty Williams was the Health Care Authority over the Ellis Unit medical department and is liable for the actions of the mid-level medical care providers working under her.

Shaw alleges that because of the delay in treating the crushed knuckle on his right hand, he no longer has full rotary movement of the fifth finger and cannot completely bend it without using the other hand.  He also alleges that his fifth finger drifts outward when his hand is relaxed and he cannot extend that finger flush with the other fingers on his right hand.  He does not have the strength in his grip as he once had.  Shaw alleges that he was a professional piano player  but can no longer play professionally.  Shaw seeks a declaratory judgment that the defendants' acts and omissions violated his civil rights.  He also seeks punitive damages of $500,000.00 against each defendant, compensatory damages of $25,000,000.00 against each defendant, and legal fees.

### B.    The Summary Judgment Evidence[3]

---

[3]

In support of their motion for summary judgment, (Docket Entry No. 174), the UTMB  Defendants have filed the following exhibits:  Shaw's TDCJ Unit Medical Records from February 13, 2007  to July 30, 2008; Shaw's TDCJ grievance file; Shaw's TDCJ Patient Liaison Records; Shaw's TDCJ Unit Medical Records from March 12, 2007 to July 31, 2008; Shaw's UTMB Medical Records; Shaw's TDCJ Unit Medical Records from March 8, 2007 to February 17, 2009; affidavits from Betty J. Williams, M.D., William Shelby, P.A.-C, Ernestine Julye, M.D., Brenda Hough, N.P., Sandra Dickey, L.V.N., Victoria Ray, L.V.N., Carol Warren, R.N., and Denise Box; Letter from Guy Smith to D. Box, dated June 20, 2007; letter from Shanta Crawford to Guy Smith, July 11, 2007; affidavit of Shanta Crawford; Shaw's Informal Grievance received April 2, 2007; Shaw's Informal Grievance received April 6, 2007; Shaw's Informal Grievance received April 23, 2007; affidavit of Anitra Manas and Grievance Worksheet, signed July 30, 2007; affidavit of Andrew DeYoung; letter from Guy Smith to Mike Hill dated November 15, 2007; letter from Andrew DeYoung to Guy Smith dated December 3, 2007; and affidavit of Kerri Paradysz, L.V.N.  (Docket Entry No. 174).

In support of their motion for summary judgment, (Docket Entry No. 176), the TDCJ  Defendants have filed the following exhibits: CMHCC Organizational Relationships Chart and Correctional Managed Care Description of Functional Responsibilities, numbered 1 to 7; portions of Shaw's TDCJ disciplinary records; portions of Shaw's TDCJ grievance records; portions of the TDCJ Offender Grievance Manual; portions of Shaw's TDCJ medical records; and portions of the TDCJ Office of Professional Standards records for Shaw.

The medical records in the summary judgment evidence reveal the following:

(1) **March 3, 2007:** cell-side visit in prehearing detention.  Shaw reported that he was involved in a fight on the previous night and complained of pain in his hand and eye. The left eye was swollen; the right hand was swollen and painful at little finger area; there was a decreased range of motion grip but good capillary refill.  There was a possible dislocation in right hand fourth and fifth fingers.  The physician on call prescribed Ibuprofen for five days and ordered Nurse Ray to get an x-ray of Shaw's right hand the following Monday.  (Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. A, p. 254).

(2) **March 3, 2007:** Presegregation psychiatric evaluation; Shaw was oriented with no suicidal ideation.  His right hand was swollen with a decreased range of motion in little finger; pulse and capillary refill was within normal limits.  A presegregation physical examination was completed by RN William Mills and Cheryl Loeffler LVN. (*Id*. at 258).

(3) **March 8, 2007:** Shaw's right hand was x-rayed.  There was mild swelling to the dorsum of the right hand; no deformity; good range of motion; circulation normal. The x-ray revealed a fracture of the distal right fifth metacarpal; right fifth metacarpal with mild angulation of knuckle; boxer's fracture.  "Shelby did not place

---

In support of his motion for summary judgment, Dr. Mehta has filed the following exhibits:  his affidavit; portions of Shaw's grievance records; portions of Shaw's TDCJ Health Services Archives records; portions of Shaw's medical records; Shaw's UTMB records; and an affidavit of Dr. John Bauer.

the hand in a splint because splint could be used as a weapon."  Shaw was referred

to orthopedic evaluation for his hand and prescribed Motrin for 14 days.  (*Id*. at 238).

**(4)**  **March 8, 2007**:  After Shaw's hand was x-rayed, the radiologist noted that the

fracture was routine and not an emergency; "boxer's fracture present through the

upper shaft of the fifth metacarpal."  (*Id*. at 271).

**(5)**  **March 16, 2007:**  Prison officials received Shaw's Form I-60 requesting that he be

medically unassigned due to the fracture of his hand.  The examination and boxer's

fracture were noted, the health summary was updated, and Shaw was medically

unassigned for ninety days.  (*Id*. at 253).

**(6)**  **April 27, 2007:**  Shaw put in a sick call request for chronic care medications.  Nurse

Practitioner Hough prescribed aspirin, Enalapril, and hydrochlorothiazide.  (*Id*. at

237).

**(7)**  **June 7, 2007:**  Shaw complained of his hand problem and reported that he had two

sets of x-rays taken.  Nurse Practitioner Hough observed that Shaw was unable to

make a fist using the fifth finger of the right hand with the hand in a relaxed position;

the fifth finger drifted outward; palpation of knuckle caused pain to the back of his

hand; and possible calcification was felt just above the knuckle.  Hough determined

that Shaw had a boxer's fracture at the fifth metacarpal.  Shaw was medically

unassigned for sixty days, ending on August 7, 2007, prescribed Ibuprofen, and

scheduled for an orthopedic evaluation in July.  An x-ray was taken of the hand.  (*Id*.

at 236).

**(8)**     **June 12, 2007:** Shaw's hand was x-rayed and showed an old boxer's type fracture with no acute bony abnormality. (*Id*. at 270).

**(9)**     **June 21, 2007:** Nurse Paradysz administered vaccinations. (*Id*. at 224).

**(10)**    **July 16, 2007:** Shaw missed a clinic visit; he had complained of pain in hand and dizziness in his sick-call request. (*Id*. at 247).

**(11)**    **August 9, 2007**: Shaw was reported as doing well on examination. His blood pressure was under control. He was prescribed Naproxen for 30 days with two refills. (*Id*. at 222).

**(12)**    **August 22, 2007:** Shaw was seen by a doctor at UTMB in Galveston. He was diagnosed with a right fifth metacarpal fracture, although no x-rays were available for review. Observation showed right hand fifth digit inward rotation and an inability to completely flex. "Will call/schedule for surgery." (*Id*. at 241).

**(13)**    **November 13, 2007:** Shaw put in a sick call request for a renewal of his prescription; Nurse Practitioner Hough prescribed Ibuprofen for 14 days. (*Id*. at 235).

**(14)**    **November 29, 2007:** Shaw was seen at UTMB Galveston by the orthopedic department. He complained of a fracture to the right hand with slight dull pain, limited motion, an inability to put weight or make a fist, and some overlap of the fifth finger when clutched fist. An x-ray showed a healed fracture of the fifth metacarpal. (*Id*. at 239).

**(15)**    **December 3, 2007:** Shaw issued a sick call request for a renewal of his prescription; Nurse Practitioner Hough prescribed Motrin. (*Id*. at 234).

8

(16)   **January 7, 2008:**  Shaw walked in complaining of fever and chest pains.  His lungs were clear.  He was prescribed Motrin and Tylenol.  (*Id*. at 252).

(17)   **January 8, 2008:**  Shaw missed a clinic visit.  (*Id*. at 244).

(18)   **January 22, 2008:**  Shaw complained of hand pain and requested medication.  P.A. Wang noted a right fifth metacarpal fracture that was healed with some angulation and weakness in the fifth finger and a limited range of motion with a "MPJ flex." (*Id*. at 233).

(19)   **February 6, 2008:**  Shaw refused a special diet.  (*Id*. at 243).

(20)   **February 20, 2008:**  Shaw issued a sick call request for medication renewal; P.A. Wang prescribed Motrin.  (*Id*. at 232).

(21)   **March 31, 2008:**  Shaw issued a sick call request for medication renewal; Nurse Practitioner Hough prescribed pravastatin for thirty days and 11 refills.  (*Id*. at 231).

(22)   **April 23, 2008:**  Shaw was seen about his prescriptions.  (*Id*. at 241).

(23)   **May 27, 2008:**  Shaw issued a sick call request for a renewal of his prescription; Dr. Williams prescribed Motrin for 30 days.  (*Id*. at 230).

(24)   **June 27, 2008:**  Shaw issued a sick call request for a renewal of his prescription; Dr. Williams prescribed Motrin.  (*Id*. at 229).

(25)   **July 15, 2008**:  Shaw issued a sick call request for a renewal of his prescription; he was prescribed Motrin.  (*Id*. at 228).

(26)   **July 15, 2008:**  Shaw issued a sick call request for medication renewal; the note states "will prescribe Motrin on July 28, 2008."  (*Id*. at 228).

(27)     **July 29, 2008**: Shaw received an explanation of the benefit of a low salt diet. (*Id.* at 221).

(28)     **July 29, 2008:** Shaw issued a sick call request for the renewal of his prescription; Dr. Williams prescribed Motrin for thirty days. (*Id.* at 227).

(29)     **August 29, 2008:** Shaw requested Naproxen for hand and hip pain. He was observed to have a normal gait. He was prescribed Naproxen. (Ex. F, p. 554).

(30)     **October 31, 2008**: Shaw was seen cell-side by Nurse Practitioner King. Shaw requested a brace and Ibuprofen for pain in his right hand, complaining that the bone had "healed wrong." He reported that he could not do push ups or other weighted activities. The radial pulse was intact and a full range of motion was noted in the fingers and wrist, with no glaring deformity except that "pinky slightly everted" from a boxer's fracture. Shaw was prescribed Ibuprofen and advised to request a brace. (Ex. F, p. 553).

(31)     **November 6, 2008:** Shaw issued a sick call request for a renewal of medication; he was ordered Ibuprofen for thirty days. (*Id.* at 552).

(32)     **November 12, 2008:** Shaw complained of tooth pain and received a dental exam. (*Id.* at 560).

(33)     **November 14, 2008:** Shaw requested a brace for his right hand because his right "pinky juts out from hand" and "patient unable to abduct finger." He was told to seek referral to the Brace and Limb Clinic. (*Id.* at 551).

(34)     **November 14, 2008:** Shaw was referred to the Brace and Limb Clinic for evaluation. (*Id.* at 578).

**(35)**    **December 11, 2008:**  Shaw's occupational therapy appointment was cancelled due to insufficient security staff.  (*Id*. at 582).

**(36)**    **December 16, 2008:**  Shaw was evaluated as a new patient at the Stiles Unit. Medical personnel noted that Shaw suffered from hepatitis C, hypertension, and hypercholesterolemia; he was added to the chronic care list of patients.  (*Id.* at 563).

**(37)**    **January 10, 2009:**  Shaw was prescribed hydrochlorothiazide.  (*Id*. at 566).

**(38)**    **January 6, 2009:**  Shaw was seen by the Occupational Therapy Clinic and evaluated for a hand brace on his right hand.  An x-ray revealed mild angulation of the right fifth knuckle.  Shaw complained of pain in the fifth metacarpal and difficulty adducting his fifth finger.  The Clinic noted impaired adduction and that Shaw's grip strength in his right hand was 60 pounds and 72 in left hand.  Shaw had no complaints of numbness, no vasomotor problems, and no coldness in his right hand. A splint was issued because the fifth finger was abducted and "hangs on things during activities."  (*Id.* at 580).

**(39)**    **January 14, 2009:**  Shaw refused follow-up occupational therapy appointment for a brace.  (*Id*. at 550).

The summary judgment evidence on the treatment Shaw received is summarized in an affidavit submitted by the defendants.  In this affidavit, Dr. Julye summarized the medical records relating to Shaw's hand injury:

> In preparing this affidavit I reviewed the patient's medical records from March 2, 2007 to present, and I reviewed the Plaintiffs complaint and Plaintiff's answers to Order for More Definite Statement.
> . . .

11

The medical record first documents Offender David Shaw's (TDCJ#1304818) injury on March 3, 2007 as charted at 7:07 am in the morning with a presegregation evaluation which is a physical assessment done by nursing staff on an offender prior to placement in disciplinary housing. Mr. Shaw injured his hand on March 2, 2007 in what Mr. Shaw describes as a fist fight with another offender. That note charts the swelling in the right hand and decreased range of motion in the ring finger. It also charts that capillary refill and pulse is normal, which is significant after the injury to demonstrate as is common that the patient is neurovascularly intact. A cell side visit is charted the same day at 8:49 am and notes the same findings, and the on call physician is phoned for orders for pain medication and an X-ray. The patient is seen March 8, 2007 with PA William Shelby for follow up for X-rays. PA Shelby's March 8, 2007 note charts that the X-rays reveal a distal fifth right metacarpal fracture with mild angulation. The metacarpal is the bone in the palm that sits between the finger and the wrist. And again he describes that a neurological and circulatory assessment is obviously intact. In short, the patient had what is commonly known as a boxer's fracture with some deformity apparent. PA Shelby writes not to splint, as the splint at this time can be used as a weapon. And he prescribes pain medication, Ibuprofen 600mg twice daily. He also writes "refer to DMS OHAND," which is Orthopedic consultation by videoclinic. The reading of the film is confirmed later by the written report from the radiologist, or physician specialist in radiology, that reads "boxer's fracture present through the upper shaft of the fifth metacarpal." The date of the X-ray exam is again, March 8, 2007, and the date of the radiologist's report is March 13, 2007. Mr. Shaw was restricted to a disciplinary cell at this time but later the patient requests that he requires medically unassigned status because of the fracture and it is allowed for an excess of 90 days in a clinic note dated March 16, 2007 as a verbal order from Nurse Practioner[sic] Brenda Hough.

On April 23, 2007 he writes a sick call request saying he needs to see a doctor about his broken hand. A written response is given that advises him that he has an orthopedic surgery appointment arranged. On June 5, 2007 he writes another sick call request to ask to be seen for his hand and he is seen by NP Hough who notes in her June 7, 2007 clinic note that he has limited flexion with the involved knuckle as he is "unable to make a fist" completely with it, and when the fingers are fully extended the right fifth finger does "drift outward." Ibuprofen is prescribed and NP Hough notes that his July Orthopedic appointment is in place. Also mentioned in the June 7, 2007 note, NP

Hough extends his medically unassigned status for another 60 days. His repeat June 15, 2007 X-ray reads "deformity of the upper shaft of the fifth metacarpal is seen in keeping with an old boxer's type fracture." It is a healed boxer's fracture.

Betty Williams MD authorized refills of Ibuprofen for the Plaintiff on June 28, 2008, July 28, 2008, November 7, 2008, December 7, 2008 and January 6, 2009[.] The refills did not require her to interview or examine the patient. The pattern of medication request and response to medication was the trend in the record.

An August 22, 2007 clinic note by Orthopedic surgery for their Videoclinic shows his first encounter with the Orthopedic specialist. Rescheduling can occur for reasons such as overbooking or missed appointments. At that time his function is noted as "inward rotation and inability to completely flex." The X-ray films were not made available for review at the time of the clinic. Surgery is written as a plan. When he sees Orthopedic surgery, a November 29, 2007 clinic note charts that face to face encounter in Hospital Galveston (HG) and its physical exam, and their notes comment their plan is only to follow up as needed. Surgery is not planned. The HG radiologist's November 29, 2007 report on his X-ray from that visit is described as "old healed boxers fracture affects the distal fifth metacarpal."

The patient's functional capacity is summarized well in his Occupational Therapy (OT) visit January 6, 2009 note, where it is described that his complaints are pain in the right fifth finger in general and specifically with writing and that it gets caught on things during some activity. The OT exam finds that he does have some difficulty with adduction, bringing the finger in alongside the fourth or ring finger. Grip strength is 60 pounds in the right hand and 72 pounds in the left hand. There are no vasomotor problems like coldness. He is fitted for a splint to decrease pain and position the fifth finger to prevent injury.

(Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. I, pp. 1-3)(citations omitted).

Dr. Julye reached the following opinions based on the record evidence:

The timely response to his injury and the clinic visits where he is interviewed, examined, prescribed medications, and referred to subspecialty appointments by unit providers are not consistent with

13

the indifference described in the plaintiff's complaint. It is quite possible that another provider would have splinted the patient initially for soft tissue swelling and healing. The chart documents that there were concerns of using the splint as a weapon as the units often have metal splints or splints with metal components. It is quite possible that another provider would have allowed for his reaching an orthopedic specialist more urgently such as 1 to 2 weeks and result in a more specialized non-metal splint. Metacarpal injuries that can be managed by closed reduction, without surgery, and with immobilization such as casting; or sometimes controlled mobilization utilizing a splint can be accomplished with an orthopedic surgeon specialist, particularly for complicated cases where surgery is likely or possibly indicated, but otherwise they can be managed in a primary care setting. Some indications for operative treatment(open reduction) include failure to achieve or maintain acceptable reduction using closed techniques, open fractures with open wounds exposing bone, multiple hand fractures, complex injuries, displaced intra-articular fractures that involve a joint space, or fractures with severe soft-tissue loss that require a stable skeleton.

My general knowledge and experience and references have found that metacarpal neck fractures such as in this case do not often require surgery. A metacarpal fracture can be at the head or knuckle of the metacarpal, or in the shaft; either the distal shaft/neck as in this case, or at the proximal shaft or the base near the wrist. Metacarpal neck fractures like this case account for approximately one in five of all hand fractures.  The typical patient is a young man who sustained this injury as a result of throwing a punch. There are many medical texts and references that state clearly that currently, there is no consensus concerning the best way to treat these neck fractures. Usually they are treated without surgery. Conservative or non-surgical treatment generally involves fracture reduction, where the bone fragments are put back into place, followed by immobilization by various means (e.g., plaster cast, splint, brace or strapping of adjacent fingers) and to various extent, even including none at all. An alternative treatment strategy is functional treatment using taping or bracing that does not restrict movement. Some authors write that fractures of the fourth and fifth metacarpal necks without rotational deformity should be treated by adjacent strapping of the ring and little fingers and by encouraging early mobilization.

If one particular treatment method could be shown to be superior to all others in terms of functional outcome or allow earlier return to work, then the economic impact would especially be considerable in

a free world working-age population. It has been concluded in the medical literature that as it pertains to validated hand function as a primary outcome measure, no single non-operative treatment regimen for fracture of the neck of the fifth metacarpal can be recommended as superior to another. The evidence available is of variable quality but all points lend to the conclusion that manipulation and splintage of fourth and fifth metacarpal neck fractures to correct volar angulation (lump in, towards the palm) is pointless, and that early mobilization leads to early functional recovery with no apparent increase in residual symptoms. For a better understanding, I will contrast this to fractures of the metacarpal head where even nondisplaced fractures, where the fragments are mostly aligned or in place, it is recommended that the injury be treated with protective splints that hold the metocarpal[sic]-phalageal joint(knuckle-finger interface) at 50 to 70 degrees of flexion for 4 to 6 weeks. Again in contrast to metocarpal[sic] neck fractures, another example is a displaced metacarpal head fracture that requires surgery as open reduction and internal fixation devices that allows early protected motion. This patient's outcome was addressed with pain management, medically unassigned periods, and eventually Occupational Therapy. My opinions are based on a review of the materials provided and a reasonable medical probability.

(Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. I, pp. 3-4).

This court analyzes the defendants' motions and the summary judgment evidence under the applicable law.

## II.   The Legal Standard on Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'– that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *See*

*Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.     Exhaustion of Administrative Remedies

Under 42 U.S.C. § 1997e, a prisoner may not file a suit under § 1983 unless administrative remedies as are available are exhausted. 42 U.S.C. § 1997e(a) (Supp. 1996). Exhaustion is a prerequisite to suit even when the prisoner seeks relief not available in grievance proceedings, such as money damages. *See Booth v. Churner*, 532 U.S. 731, 740-41 (2001). When a prisoner fails to

exhaust his administrative remedies before filing suit without a valid excuse, the court may dismiss the action without prejudice to its refiling after the prisoner exhausts his administrative remedies. *See Wendell v. Asher*, 162 F.3d 887, 890-92 (5th Cir. 1998);[4] *Gordon v. Pettiford*, 271 Fed. App'x 464, 464 (5th Cir. 2008) (per curiam).  When exhaustion is precluded because the deadlines for the administrative remedies have passed, the action is properly dismissed with prejudice.  *Johnson v. La. ex rel. La. Dep't of Pub. Safety & Corr.*, 468 F.3d 278, 278-81 (5th Cir. 2006) (per curiam).

A court does not "inquire whether administrative procedures satisfy minimum acceptable standards of fairness and effectiveness"; prisoners simply "must exhaust such administrative remedies as are available, whatever they may be." *Alexander v. Tippah County*, 351 F.3d 626, 630 (5th Cir. 2003) (citations and internal quotation marks omitted).  Substantial compliance with administrative procedures is insufficient.  *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001).  Unless the prisoner pursues his "grievance remedy to conclusion," he has not exhausted "available remedies." *Id*.

Failure to exhaust administrative remedies under the PLRA is an affirmative defense.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Carbe v. Lappin*, 492 F.3d 325, 327 (5th Cir. 2007).  The defendants have the burden on summary judgment to establish that Shaw did not exhaust the available administrative remedies.

TDCJ prisoners must pursue their administrative remedies under a two-step grievance procedure.  *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004).  An inmate has fifteen days from the date of the incident to file a Step 1 grievance, which is handled within the prison facility. *Id*.  If

---

[4]    Although *Wendell* was partially overruled by *Jones v. Bock*, 549 U.S. 199, 127 S. Ct. 910, 166 L. Ed.2d 798 (2007), *see Richbourg v. Horton*, No. 08-10443, 2008 WL 5068680, at *1 (5th Cir. Dec. 2, 2008) (per curiam), the proposition for which it is cited remains good law.

the prison returns a grievance unprocessed, the inmate has fifteen days to correct the grievance and resubmit it.  If unsatisfied with the response, the inmate has fifteen days to file a Step 2 grievance, which is handled at the state level, *Johnson*, 385 F.3d at 515.

Shaw filed a Step 1 grievance, #2007130736, on April 6, 2007.  He complained about pain in his right hand and requested medical attention.  (Docket Entry No. 175, Dr.  Mehta's Motion for Summary Judgment, Appendix B, pp. 8-9).  The response to the Step 1 grievance explained that Shaw's hand injury had been evaluated and treated appropriately.  (*Id*.).  On May 23, 2007, Shaw filed a Step 2 grievance, #2007130736.  (*Id*. at 5-7).  The Step 2 grievance response reiterated that the hand injury had received appropriate medical attention and listed the dates of appointments and treatments provided.  (*Id*. at 7).

On July 26, 2007, Shaw filed a Step 1 grievance, #2007196411.  (*Id*. at 3-4).  In this grievance, he again complained about pain in his right hand and complained about the care provided by the Ellis Unit Medical Department.  He requested medical attention.  (Docket Entry No. 175, Dr. Mehta's Motion for Summary Judgment, Appendix B, pp. 3-4).  The response to this grievance explained that Shaw was receiving medical attention in accordance with UTMB's treatment protocol.  Shaw appealed by filing a Step 2 grievance, #2007196411.  (*Id*. at 1-2).  Shaw expressed his dissatisfaction with the medical care the Ellis Unit medical department was providing him. (*Id*.).  The response noted the examinations, x-rays, and medications Shaw received for his hand injury.  (*Id*. at 2).

Dr. Mehta first examined Shaw on August 22, 2007.  Shaw filed Step 1 grievances about his hand injury on April 6, 2007 and July 26, 2007, well before Dr. Mehta examined Shaw.  The grievances do not raise any complaints against Dr. Mehta.  Shaw has failed to exhaust his claims against Dr. Mehta.  Shaw also failed to exhaust his claims against defendants Box, Crawford,

18

Manas, and DeYoung, because he failed to submit grievances raising any complaints about them. Shaw's claims against Dr. Mehta, Box, Crawford, Manas, and DeYoung are dismissed for failure to exhaust administrative remedies as required by the PLRA. As set forth below, the court finds, alternatively, that Shaw's claims against Dr. Mehta, Box, Crawford, Manas, and DeYoung lack merit.

## IV.    The Claims Against the Defendants in Their Individual Capacities

### A.    Qualified Immunity

The defendants assert that as a matter of law, they are entitled to qualified immunity because Shaw failed to allege a constitutional violation and because the undisputed evidence shows that their actions were objectively reasonable in light of clearly established law. Qualified immunity shields government officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Fraire v. Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992) (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wilson v. Layne*, 526 U.S. 603, 614 (1999).

A two-step process has traditionally been used to evaluate qualified immunity. *Saucier v. Katz*, 533 U.S. 194 (2001). A court must first consider whether "the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 201. Second, if the plaintiff has satisfied the first step, a court decides whether the right was "clearly established" when the challenged act occurred. *Id.* More recently, the Supreme Court held that a case may be dismissed based on either step in the qualified immunity analysis. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

### B.    The Denial of Medical Care Claim

The Eighth Amendment prohibition against cruel and unusual punishment forbids deliberate indifference to the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

Deliberate indifference to the serious medical needs of prisoners may violate the Eighth Amendment, whether the indifference is manifested by prison doctors or by prison guards and whether it is intentionally denying or delaying access to medical care. *Harris v. Hegmann,* 198 F.3d 153, 159 (5th Cir. 1999); *Estelle v. Gamble,* 429 U.S. 97 (1976).  "Deliberate indifference is an extremely high standard to meet." *Domino v. Texas Dep't of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001).  Deliberate indifference requires a showing of unnecessary and wanton infliction of pain, rising "to the level of egregious intentional conduct." *McCormick v. Stalder,* 105 F.3d 1059, 1061 (5th Cir. 1999); *Gobert v. Caldwell,* 463 F.3d 339, 351 (5th Cir. 2006).

A prison official may not be found liable under the Eighth Amendment unless the official knows of and disregards an excessive risk to inmate health or safety.  *Farmer v. Brennan,* 511 U.S. 825, 839-40 (1994).  The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference.  *Id*. at 837.  The "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference.  *Farmer,* 511 U.S. at 838.  Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of that risk.  *Id; Reeves v. Collins,* 27 F.3d 174 (5th Cir. 1994).

A claim that prison medical personnel made an incorrect diagnosis does not state a cause of action for deliberate indifference in providing medical care.  *Domino v. Texas Department of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001) (citing *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir. 1985)).  A decision not to provide additional or different treatment "is a classic example of a matter for medical judgment" rather than a basis for an Eighth Amendment claim.  *Estelle,* 429 U.S. at 107.  "Disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs." *Norton v. Dimizana,* 122 F.3d 286, 292 (5th Cir. 1997).  A plaintiff

must allege and raise a fact issue as to whether prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson,* 759 F.2d at 1238.

Deliberate indifference is especially difficult to show when the inmate has been provided with ongoing medical treatment.  "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference." *Gobert*, 463 F.3d at 346 (citations omitted). Records showing that an inmate was given medical examinations, treatments, and medications may rebut an inmate's allegations of deliberate indifference in denying or delaying medical care. *See Varnado v. Lynaugh,* 920 F.2d 320 (5th Cir. 1991).

This court considers Shaw's claims against each of the defendants he claims to have been deliberately indifferent to his serious medical needs.

### (1)    Betty J. Williams, M.D.

Shaw claims that Dr. Williams failed properly to manage and train the Ellis Unit medical personnel under her authority and supervision and allowed them to act with reckless disregard to his serious medical condition by denying him proper pain medications and making frivolous replies to his requests for help, such as by telling him to file another complaint. (Docket Entry No. 7, Plaintiff's More Definite Statement, pp. 4-5).

Dr. Williams submitted the following affidavit testimony:

> I am employed by the University of Texas Medical Branch as a physician and as Medical Director of the Ellis Unit of the Texas Department of Criminal Justice. I have held this position since 2003. I have worked for UTMB as a doctor since 2002. I have been licensed by the Texas State Medical Board of Medical Examiners since 1973.
>
> I have reviewed Plaintiff's medical records. Based on my review, I conclude that I never examined Plaintiff regarding his fractured right

hand. I also did not treat Shaw for this injury at any time, nor was I asked to examine him or treat him at any time. While the medical records include a letter from Plaintiff to me, dated November 12, 2008, and received at the unit on November 13, 2008, I know that I did not see Plaintiff. Rather, the initials on the letter are those of Nurse Practitioner Abbe King, who noted on the letter that Plaintiff was making a sick call request to see a provider. The medical records reflect that Nurse Practitioner King, as the provider, examined Plaintiff the next day, November 14, 2008. The records indicate that I authorized five refills of Ibuprofen for Plaintiff on June 28, 2008, July 28, 2008, November 7, 2008, December 7, 2008, and January 6, 2009.  My orders regarding prescription refills are a routine part of my job as a medical doctor and prescribing authority and are routinely made on the recommendation of physician's assistants. The Ibuprofen refill orders in this case did not require my examination or treatment of Plaintiff or my personal knowledge of any specific facts relating to his diagnosis or treatment.

(Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. G, pp. 1-2).

Dr. Williams cannot be found liable under the Eighth Amendment unless she knew of and disregarded an excessive risk to Shaw's health.  *Farmer v. Brennan,* 511 U.S. at 839-40.  The summary judgment evidence shows that although she never personally examined Shaw, Dr. Williams reviewed the records and authorized the prescription of pain medications on five occasions.  Shaw has not demonstrated that Dr. Williams was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that she drew the inference.  As discussed in Section IV-F, Shaw's claims against Dr. Williams based on inadequate supervision also lack merit.    Shaw has not raised a fact issue as to whether Dr. Williams acted with deliberate indifference under the Eighth Amendment.  Dr. Williams is entitled to judgment as a matter of law.

**(2)     William Shelby, P.A.C.**

Shaw alleges that Physician's Assistant Shelby refused to put a splint on the broken hand, which prevented proper healing.  (Docket Entry No. 7, Plaintiff's More Definite Statement, p. 5). Shelby submitted an affidavit stating as follows:

> From September 2005 to April 2007 I worked as a physician assistant for University of Texas Medical Branch Correctional Managed Care. . . .
> I have worked in medical care for about 35 years, more than 10 of which have been in correctional medicine and urgent care. . . .I examined Plaintiff's right hand and reviewed the available X-rays on March 8, 2007.  I diagnosed Plaintiff as having a stable, non-displaced fracture of the right 5th metacarpal, commonly known as a "Boxer's Fracture," an injury commonly seen among prison inmates. The X-rays showed the fracture to be stable and not displaced, and my physical examination of Plaintiff's hand confirmed the radiological findings.  Because Plaintiff's fracture was stable and not displaced, I determined, based on my training and experience, that it was unnecessary to apply a splint to Plaintiff's hand.  Had Plaintiff presented with an unstable, displaced fracture, I would have arranged to have him transported to Hospital Galveston for emergency care. Based on my training and experience with a great many similar injuries, I did not think an emergency referral to Hospital Galveston was warranted in the circumstances of this case. Instead, based on by[sic] training and experience, since Plaintiff's fracture was stable and not displaced, pain management was all that was required and I did not think a splint or cast was indicated at that time.  As such, I requested that Plaintiff be prescribed Ibuprofen. Moreover, based on my experience as a physician assistant in the TDCJ-ID system, I was acutely aware that a hand splint could have presented a security risk, since it is not uncommon for offenders to fashion weapons out of splints to be used to assault security staff, non-security staff, i.e. Medical personnel or other offenders.  At the time I made the decision not to splint this fracture I was made aware by security staff the Plaintiff was allegedly involved in a fight with another offender. In light of all the circumstances, I ordered pain medication, Ibuprofen, for Plaintiff and referred him to an orthopedic specialist for further care and treatment.  I think it important to note that casting is typically the purview of the Orthopedic surgeon after his or her evaluation.
>
> I was not required to address Plaintiff's work restrictions on an HSM-18 form, since he was housed in administrative segregation and had no work assignment at the time of my examination.  I believe that any

> other reasonably well-trained physician's assistant, under the same
> or similar circumstances, and knowing only what I knew at the time,
> would believe that the actions I rendered were timely, appropriate
> and provided in good faith and with the reasonable belief that they
> were consistent with the laws of the United States and the State of
> Texas.

(Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. H, pp. 1-3).

The undisputed facts show that as a matter of law, Shelby did not act with deliberate

indifferent to an obvious risk to Shaw's health by refusing to put a splint on the hand. *Farmer v.*

*Brennan,* 511 U.S. at 839-40. Shelby examined the hand and the x-ray. The fracture was stable and

not displaced; a splint was not medically necessary. In addition, a splint presented a security

problem. The record does not present facts from which Shelby could or did infer that a substantial

risk of serious harm existed if he did not apply a splint. Shelby is entitled to judgment as a matter

of law.

### (3)    Brenda Hough, Nurse Practitioner

Shaw asserts that Nurse Practitioner Hough falsely documented that she gave him a physical

examination on March 16, 2007, when he was released from solitary confinement and his work

restriction was removed.

In her affidavit, Hough testified as follows:

> I am employed by UTMB Correctional Managed Care as a Nurse
> Practitioner (NP). I have held this position since June 2004. I am
> presently working at the Eastham Unit as a NP. I have been a NP
> since September 2003. I worked at the Ellis Unit in 2007, and I
> provided care to Plaintiff regarding the boxer's fracture of his right
> hand.
>
> Plaintiff claims in this lawsuit that I falsely documented that I gave
> him a physical examination upon his release from solitary
> confinement on March 16, 2007. He further claims that I provided
> false documents when I re-instated medical restrictions without
> conducting an examination. Plaintiff is incorrect. I did not provide

24

false documentation, and I did not indicate that I had examined Plaintiff on March 16, 2007.  Further, the order implementing medical restrictions was proper.

On March 16, 2007, Plaintiff submitted an I-60 (inmate's request to official), requesting to be medically unassigned from work due to a fracture of his hand.  I made an entry in the clinical notes that Plaintiff had been seen by a provider on March 8, 2007, for a boxer's fracture
of the right 5th metacarpal. I discussed the diagnosis with the provider and gave verbal orders that Plaintiff was to be medically unassigned from work for 90 days and his HSM-18 (document reflecting medical restrictions) was to be updated to reflect such.  On March 27, 2007, I did a chart review and renewed Plaintiff's medicines at his request: aspirin 325 mg, Enalapril 10 mg, and Hctz 25 mg. On June 7, 2007, Plaintiff was seen for his sick call request in which he was complaining of hand problems. He stated that he had two sets of x-rays taken.  I observed that Plaintiff was unable to make a fist using the 5th finger of the right hand, and with his right hand in a relaxed position, the 5th finger drifted outward. Palpation of the knuckle caused pain to the back of his hand.  I noted that there was possible calcification felt just above the knuckle.  I noted that he had a boxer's fracture of the 5th metacarpal. I extended his status as medically unassigned from work for 60 days, to expire August 7, 2007.  I ordered ibuprofen, 600 mg, one tablet for 30 days, KOP (keep on person).  I noted that Plaintiff had a scheduled DMS Ortho (Digital Medical Services - Orthopedics) appointment in July for evaluation. He was encouraged to keep his appointment when he received his lay-in.  An x-ray of the hand was done on June 12, 2007.

On June 26, 2007, I reviewed the radiology report but no new orders were given.  On August 21, 2007, Plaintiff submitted a sick call request, claiming that his work restrictions were lifted.  The provider incorrectly informed Plaintiff that I had removed his medically unassigned restrictions when, in fact, the restriction had expired. Plaintiff had an appointment with HG Ortho (Hospital Galveston, Orthopedics Department) by telemed on August 22, 2007.  On November 13, 2007, Plaintiff submitted a sick call request, asking to see someone about the pain in his hand.  I ordered ibuprofen, 800 mg, one tablet for 14 days, KOP, for the pain.  Plaintiff repeated the sick call request on December 1, 2007, and I ordered ibuprofen 600 mg, for 30 days, with two refills.  On April 23, 2008, Plaintiff was seen per his sick call request to renew pain medication for his hand. I noted that he had KOP Motrin picked up on April 22, 2008.

(Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. J, pp. 1-3).

The record shows that on March 16, Hough consulted with another member of the medical staff and made a notation in the medical records that Shaw should not be assigned to a work duty for ninety days. She later examined Shaw and noted that his fifth finger drifted outwards when his hand was in a relaxed position. She responded to his requests for pain medications by prescribing Ibuprofen. The undisputed facts show that Shaw has no basis for his conclusory allegation that Hough falsely stated in the medical records that she had examined Shaw or that she ordered the medical restriction on his work assignment lifted. The record shows that as a matter of law, Hough cannot be held liable for acting with deliberate indifference to a known risk to Shaw's health. Hough is entitled to judgment as a matter of law.

### (4)    Sandra Dickey, LVN

Shaw alleges that on June 6, 2007, he complained to Nurse Dickey about pain and numbness in his right hand. In response, according to Shaw, Dickey stated: "you have a pending appointment with ortho in July 'PSC.'"[5]  Shaw alleges that this amounts to denying him medical treatment with deliberate indifference to his serious need. (Docket Entry No. 46, Amended Complaint, p. 5).

Nurse Dickey testified as follows:

> I am employed by UTMB Correctional Managed Care as a licensed
> vocational nurse (LVN). I have held this position since April 2,
> 1990. I am presently working at the Byrd Unit as a LVN. I have been
> a LVN since 1977. My involvement in the care of Plaintiff involves
> answering two sick call requests. The medical records indicate that
> on March 16, 2007, I received an I-60 (an inmate's request to an
> official) from Plaintiff requesting that he be medically unassigned for

---

[5]  The court has learned through telephone inquiry that "PSC" means "Provider sick call." This notation indicates that the inmate is scheduled to be seen by a physician, physician's assistant, or nurse practitioner.

work due to the fracture of his hand.  I noted in the medical records that he had been seen by the provider on March 8, 2007, and had been diagnosed with a boxer's fracture of the right hand, fifth metacarpal. After discussing Plaintiff's request with the medical provider, I obtained an order from the provider for Plaintiff to be medically unassigned from work for 90 days.  On June 6, 2007, I answered another sick call request from Plaintiff.  Plaintiff complains in this lawsuit that I stated, "You have a pending appointment with ortho in July PSC."  My statement was correct.  The medical records show that on June 7, 2007, at his sick call exam, Plaintiff was told that he had a scheduled dms ortho (Digital Medical Services - orthopedics) appointment in July for evaluation and he was encouraged to keep his appointment when he received his lay in. I never actually saw Plaintiff for complaints about his hand, and I was not asked to see him about these complaints.  I had no other involvement in his care but answering the two (2) sick call requests.

(Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. K, pp. 1-2).

The defendants also submitted an affidavit from Carol Warren, the Nurse Manager for the Northeast District of the University of Texas Medical Branch— Correctional Managed Care who supervised nursing personnel at fourteen TDCJ facilities (but did not supervise any of the defendants).  In her affidavit, Warren stated as follows:

I have been asked to review the conduct of Defendants Cheryl Loeffler, Sandra Dickey, Kerri Paradysz, and Victoria Ray, all defendants in the instant lawsuit. Each of these women is a Licensed Vocational Nurse currently or formerly employed by UTMB-CMC, but at no time was any under my supervision. In preparing this affidavit, I have reviewed Plaintiff's Original and Amended Complaints, filed pursuant to 42 U.S.C. § 1983, Plaintiff's Answers to the Court's Order for More Definite Statement, and Plaintiff's medical records from February 13,2007 through February 17, 2009.

My supervisory duties require that I be familiar with the education and training required for Licensed Vocational Nurses in the State of Texas, as well as their scope of practice. The Defendants are all Licensed Vocational Nurses and educated in practical nursing practice and tasks as defined by the Texas Board of Nursing.  It is not within the scope of practice for an LVN to 'order' any treatment, restriction or medication for any patient.  These orders would be provided by a mid-level licensed practitioner, such as a Nurse

Practitioner or Physician's assistant, or by a physician. The licensed nurse would then be expected to follow any and all orders documented in the medical record.

. . .

On March 16, 2007, a Sick Call Request was received from Mr. Shaw, where he requested to be medically unassigned. Ms. Dickey referred this request to a mid-level medical provider, as appropriate, and Mr. Shaw was unassigned from work for ninety (90) days (Ex. A, p. 253).

(Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. M, pp. 1-2).

The undisputed facts in the record show that Dickey reviewed medical records and responded to two sick-call requests from Shaw. The record shows that she obtained an order relieving him from work assignments for 90 days and told him about a scheduled appointment. Shaw has not identified facts raising a fact issue as to whether Dickey was deliberately indifferent to a substantial risk of harm to Shaw's health. Dickey is entitled to judgment as a matter of law.

### (5)   Victoria Ray, LVN

Shaw alleges that on March 3, 2007, Nurse Ray made an entry in the clinic notes stating – falsely – that she had examined Shaw and that she had followed an order from the on-call doctor to schedule Shaw for x-rays on March 5. (Docket Entry No. 46, Amended Complaint, p. 4). In an affidavit that is part of the summary judgment evidence, Ray testified as follows:

I am employed by UTMB Correctional Managed Care as a licensed vocational nurse (LVN). I have held this position since 2001. I am currently a LVN at the Estelle Unit. In March of 2007, I was working as a LVN at the Ellis Unit. Plaintiff claims in this lawsuit that on March 3, 2007, I completed a clinic note for observation but never actually saw Plaintiff. Plaintiff claims that I falsified documents. Plaintiff is incorrect. I did see Plaintiff on March 3, 2007. I did not falsify documents. As the medical records show, on March 3, 2007, I made a cell-side visit to Plaintiff due to the fact that he was in PHD (pre-hearing detention) because he was in a fight the previous night. As stated in the medical records, Plaintiff told me that he was in a fight and his eye and hand hurt, and I observed that Plaintiff had "left eye ecchmotic and swollen rt hand swollen and painful at little finger

28

> area." I assessed Plaintiff as having a contusion to the left eye and possible fracture or dislocation of the right hand at the 4th and 5th finger. As stated in the medical entry, I called the doctor and obtained orders for ibuprofen, 800 milligrams, and for an x-ray of the hand to be taken on the following Monday. This was my only involvement with medical care concerning Plaintiff's hand. I saw Plaintiff on rounds after that once, but he did not voice any complaints and I was not asked to take any action regarding medical care for his hand after that point.

(Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. L, pp. 1-2).

Warren reviewed the records as to Ray's involvement in Shaw's care and gave the following assessment:

> On March 3, 2007, at 0849 hours, Ms. Ray received orders from the physician to give Motrin 800 mg TID (three times daily) for five days and to have the right hand x-rayed on Monday, March 6, 2007 (Ex. A, p. 254). Ms. Ray did not see Mr. Shaw again until March 16, 2007 (Ex. A. p. 255), when she completed segregation rounds and noted no complaints from Mr. Shaw. By that time, the x-rays had already been taken.

(Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. M, p. 2).

The record shows that Nurse Ray saw Shaw in his cell the morning after he injured his hand and that she noted his injuries. She consulted a physician and received orders for Shaw to receive pain medications and to have an x-ray the next Monday. The record discloses no facts consistent with Shaw's allegation that Ray falsified the medical records or failed to carry out a doctor's order. Ray is entitled to judgment as a matter of law.

### (6)   Kerri Paradysz, LVN

Shaw alleges that on August 4, 2007, Nurse Paradysz failed to schedule him for a clinic visit despite his request, violating prison policy. (Docket Entry No. 46, Amended Complaint, pp. 4-5).

Nurse Paradysz testified as follows:

29

> I was employed by UTMB Correctional Managed Care as a licensed vocational nurse (LVN) from 2006 to 2007.  Plaintiff claims in this lawsuit that I failed to schedule him for a clinic visit after he requested such.  Plaintiff is incorrect.  As shown by the I-60 (inmate request to official) in Plaintiff's records, on August 3, 2007, Plaintiff asked if he was still scheduled to see the Orthopedic Department of UTMB's Hospital Galveston. As shown by the same document, I responded the next day, "You are still scheduled." The medical records indicate that my statement to Plaintiff was correct. The medical records indicate that Plaintiff visited the Orthopedic Department at Hospital Galveston on August 22, 2007.

(Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. R, p. 1).

In reviewing the medical records relating to Paradysz's involvement, Warren noted that "on August 3, 2007, Mr. Shaw submitted a Sick Call Request stating that he was supposed to be seen by orthopedic specialists in July and asking whether he was still scheduled for the specialists. Ms. Paradysz responded that Mr. Shaw was still scheduled for Ortho (Ex. D, p. 189)."  (Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. M, p. 2).  Warren further observed that the interaction between Paradysz and Shaw was extremely limited.  (*Id.*).

There is no basis in the record to show that Paradysz denied or delayed providing needed medical attention to Shaw or that she refused to schedule him for a clinic visit, as he alleged.  Paradysz is entitled to judgment as a matter of law.

### (7)    Denise Box, Practice Manager

Shaw alleged that Box received a list of questions from Guy Smith, a TDCJ Program Administrator, about Shaw's medical needs and that Box failed to respond.  Box submitted an affidavit stating as follows:

> I am employed by UTMB Correctional Managed Care as the Huntsville District Practice Manager.  I am not a doctor and I have no medical training.  My job involves oversight of 14 outpatient clinics and a 116-bed inpatient facility, which entails the coordination of health care services, information management, and provision of

services in accordance with applicable state/federal laws.  I have held this position since 2005.  Plaintiff claims in this lawsuit that I was presented with a list of questions by Guy Smith, TDCJ Program Administrator III, concerning issues of Plaintiff's alleged "serious medical needs," and there was no indication that I responded. Plaintiff refers to Mr. Smith's letter of June 20, 2007.  Further, Plaintiff claims that I "failed to participate in assuring that Plaintiff received the medical attention he needed. . . ."  Plaintiff is incorrect in his assertion that I failed to respond to the list of questions posed by Guy Smith in his letter of June 20, 2007.  As shown by Mr. Smith's letter of June 20, 2007, a copy of which is attached to my affidavit, Mr. Smith asked me about certain questions, i.e., why Plaintiff was not given a physical before being placed in pre-hearing detention. Practice Manager Shanta Crawford (who I supervise) responded to the letter on my behalf.  As shown by Ms. Crawford's letter of July 11, 2007, which is also attached to my affidavit, Ms. Crawford responded fully to all of Mr. Smith's questions.  Finally, Plaintiff is incorrect in his assertion that I failed to assure that he receive the medical attention he needed.  As stated, I am not a doctor and I have no medical training.  My job was not to medically treat inmates.  Rather, my job was to provide information in response to questions concerning the medical care of the inmates.  Either I can provide the information or I can have a practice manager under my supervision provide the information.  I complied with my duties and ensured that information was provided by Ms. Crawford that answered Mr. Smith's questions.

(Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. N, pp. 1-2).

Box is not a medical professional.   The record shows that Box responded to the questions from Guy Smith by asking a practice manager to review the records and explain Shaw's treatment. The record is devoid of any facts showing that Box acted with deliberate indifference to Shaw's serious medical needs.  Box is entitled to judgment as a matter of law.

### (8)    Shanta Crawford, Practice Manager

Shaw alleges that on March 31, 2007, he sent an inmate request to Crawford, a practice manager, asking her to intervene and provide him medical treatment.  Shaw claims that Crawford responded by saying there was nothing that she could do and that his problem was not

"administrative in nature."  Shaw asserts that on April 1, 2007, he sent Crawford an "informal

resolution attempt," to which she responded that he had been seen by medical professionals on

March 16, 2007.  Shaw alleges that he was not seen on that date and that Crawford falsified

documents.  (Answers to More Definite Statement, p. 4).

In her affidavit, Crawford testified as follows:

> I am employed by UTMB Correctional Managed Care as a Practice
> Manager for the Huntsville area prisons of TDCJ. I work under the
> direct supervision of the Huntsville District Practice Manager, Denise
> Box.  I am not a clinician; I do not have a license to practice
> medicine; and I have no medical training.  My job involves
> responding to questions about the medical care of the prison inmates.
> I collect the information and submit responses to the questions.
> Plaintiff claims in this lawsuit that on March 31, 2007, he sent me an
> I-60 (inmate request to official), asking me to provide him medical
> treatment for his "broken right hand."  He claims that I responded by
> saying that there was nothing that I could do because his problem was
> not administrative in nature.  He claimed that I was deliberately
> indifferent to his claimed serious medical need. Further, Plaintiff
> claims that on April 1, 2007, he sent me a document seeking informal
> resolution.  He claims that I responded by saying that he was seen on
> March 16, 2007. Plaintiff claims this was false documentation
> because he was not seen on that date.  Plaintiff's contentions about
> my responses are incorrect.  I have attached relevant pages from
> Plaintiff's informal grievance file, and they reflect the responses that
> I made to Plaintiff's complaints.  On April 2, 2007, I received a
> complaint from Plaintiff requesting medical attention. I responded on
> April 13, 2007, by telling him to submit a sick call request to be seen.
> See Exhibit 1 attached.  On April 6, 2007, I received a complaint in
> which Plaintiff complained that he was being denied access to
> medical care for hand problems.  I responded on April 13, 2007, by
> telling him that he was seen on March 16, 2007.  See Exhibit 2
> attached.  Now that I have had a chance to go back and look at the
> medical records, I realize that I was correct in noting that Plaintiff
> had seen a medical provider but was mistaken as to the date.  The
> medical records indicate that on March 16, 2007, Nurse Practitioner
> Brenda Hough noted that Plaintiff had been seen by the medical
> provider on March 8, 2007 and that on March 16, 2007, Ms. Hough
> had discussed Plaintiff's condition with the provider and updated
> Plaintiff's HSM-18.  Contrary to Plaintiff's assertion, I did not falsify
> documents. On April 23, 2007, I received a complaint from Plaintiff

indicating that he was not satisfied with his treatment. I responded that Plaintiff was seen and treated appropriately on March 3, and March 8, 2007, that the medical provider reviewed medication on April 27, 2007, and that if Plaintiff was still having problems, he was to submit a sick call request. See Exhibit 3 attached. Finally, Plaintiff is incorrect in his assertion that I was deliberately indifferent to his claimed serious medical needs. As stated, I am not a doctor and I have no medical training. My job was not to medically treat inmates. Rather, my job was to provide information in response to questions concerning the medical care of the inmates.

(Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. O, pp. 1-3).

The record shows no basis for Shaw's allegations against Crawford. At most, the record shows that in responding to each of Shaw's requests, Crawford gave the appropriate information, but on one response gave an incorrect date of a medical examination. As discussed in Section IV-F, Shaw's claims against Crawford based on inadequate supervision also lack merit. Crawford is entitled to judgment as a matter of law.

### (9)    Anitra Manas, Administrative Secretary

Shaw asserts that Manas provided misinformation during the investigation of Shaw's Step 1 grievance. Manas testified as follows:

I am employed by the University of Texas Medical Branch as a Business Coordinator, a position that I have held since Jan. 27, 2009. Before I took the position as Business Coordinator, I was employed by UTMB Correctional Managed Care as an Administrative Secretary in UTMB's Huntsville District Office, a position that I held since December 2005. I have been employed by UTMB since Nov. 22, 2004. In my capacity as Administrative Secretary, which I held at all times relevant to this lawsuit, my duties included (1) coordinating daily office activities; (2) typing meeting minutes, memoranda and affidavits; (3) composing, typing and proofing finished copies of confidential correspondence; (4) developing and monitoring department record-keeping and filing systems; (5) updating and producing statistical and financial reports bi-weekly and monthly; (6) maintaining a grievance database; and (7) providing direct administrative support to the District Management Team. I am not a physician, and I do not have a medical license. None of the

positions I have held with UTMB since November 2004 has involved medical treatment or care of offender patients.  Plaintiff mistakenly claims that I provided misinformation during the investigation of Plaintiff's Step 1 grievance.  On July 30, 2007, I completed a grievance investigation form, a copy of which is attached hereto and incorporated herein by reference.  In that grievance investigation form, I wrote that Plaintiff was being seen and treated 'per protocol.'  By that I meant only that the physician's assistant's statements on the grievance investigation form indicated that Plaintiff had received medical treatment for his injured hand.  I did not, and could not give any opinion about the adequacy of medical treatment since I am not qualified to do so.  The physician's assistant wrote on the grievance investigation form that Plaintiff had been seen on June 7, 2007, for hand pain, that an X-ray had been taken on June 12, 2007, that the X-ray showed an old healed fracture, and that Plaintiff did not show up for a follow-up appointment on July 16, 2007.  I also stated on the grievance investigation form that Plaintiff was currently scheduled for "CCC," which refers to the Chronic Care Clinic since at that time, Plaintiff was scheduled for the Chronic Care Clinic.  Finally, I wrote that if Plaintiff was still having problems he could submit a sick call request.  Even if an inmate's grievance is denied, TDCJ inmates are entitled to submit a sick call request if they believe they are still having health problems.

(Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. P, pp. 1-2).

Manas is not a medical professional.  The record shows that Manas reviewed medical records and responded to Shaw's grievance by summarizing what the medical records showed about what treatment he had received.  There is no basis to support Shaw's allegations that Manas provided "misinformation" about the record contents, in violation of his constitutional rights.  Manas is entitled to judgment as a matter of law.

### (10)   Andrew DeYoung, Administrator

Shaw alleges that DeYoung, who at the time was an administrator for UTMB's Clinical Operations, should have arranged for him to have surgery after learning in December 2007 that it had not been performed.  Shaw alleges that DeYoung knew that surgery had not been scheduled for Shaw's hand and should have taken steps to ensure that it was arranged.

34

DeYoung's affidavit states as follows:

> I have been employed by the University of Texas Medical Branch Correctional Managed Care as director of Healthcare Information Management since March 1, 2009.  From April 2007 to September 2008, I was an administrator for Clinical Operations, with daily responsibility for Hospital Galveston, which treats offenders incarcerated in the Texas Department of Criminal Justice Correctional Institutions Division. . . . At all times relevant to Plaintiff's lawsuit, I worked as an administrator for UTMB in Clinical Operations.    Among my responsibilities was the investigation – after the fact – of what treatment had or had not been provided to offender patients.  On Nov. 15, 2007, I received a copy of a memorandum from Guy Smith, Program Specialist III for TDCJ Health Services Division, to Mike Hill, administrator for UTMB Correctional Managed Health Care, a copy of which is attached hereto and which is incorporated herein by reference.  Smith asked why Plaintiff had not been scheduled for surgery as recommended by the specialist on Aug. 22, 2007.  Smith wrote that a TDCJ grievance investigator had been able to obtain an appointment for Plaintiff on Nov. 29, 2007, to be evaluated at Hospital Galveston by an orthopedic specialist regarding his need for surgery.  Upon receiving Smith's letter, I investigated the incident and learned that a plastic surgery resident at Hospital Galveston, Dr. Mehta, was unaware that he was expected to schedule the surgery following the telemedicine consultation on Aug. 22, 2007.  In my Dec. 3, 2007, letter to Smith, which is also attached hereto and incorporated herein by reference, I explained to Smith what had happened and assured him that it would not occur again. Plaintiff claims that after I wrote to Smith, I should have arranged for him to have surgery.  Plaintiff incorrectly assumes that I had authority to order surgical procedures.  As I am not a physician, but an administrator for Clinical Operations, my sole focus was simply to investigate why Plaintiff had not been scheduled for surgery. Moreover, when I wrote to Smith on Dec. 3, 2007, Plaintiff already had been scheduled to be evaluated on Nov. 29, 2007, regarding his need for surgery.  In addition, the telemedicine clinic through which Plaintiff was seen in August 2007, as well as the scheduling office associated with that clinic, did not report to me, but to Correctional Managed Care.

(Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. Q, pp. 1-3).

DeYoung is not a medical professional.  The record shows that DeYoung reviewed medical

records and responded to a letter from Guy Smith about Shaw's grievances.  In response to Smith's

letter, DeYoung investigated why Shaw had not been scheduled for surgery.  There is no basis to conclude that in not personally arranging for the surgery to occur, DeYoung was deliberately indifferent to Shaw's serious medical needs.  Not only did DeYoung not have the authority to schedule Shaw for surgery, the records DeYoung reviewed showed that Shaw had recently been medically evaluated to determine his need for the surgery.  Shaw has not demonstrated that DeYoung was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that he drew the inference.  As a matter of law, based on the undisputed facts in the record, DeYoung did not act with deliberate indifference in violation of Shaw's Eighth Amendment rights.  DeYoung is entitled to judgment as a matter of law.

### (11)   Ankur Mehta, Physician

Shaw contends that Dr. Mehta signed an out-patient clinic note form on August 22, 2007 after a "telemed" evaluation.  In the note form, Dr. Mehta wrote, "schedule for surgery."  Shaw alleges that when DeYoung asked about the surgery, Dr. Mehta contradicted himself and falsely stated that he did not know he was supposed to schedule surgery for Shaw.  According to Shaw, had Dr. Mehta been truthful when questioned, surgery could have been performed and Shaw would not have suffered the pain, numbness, and deformity in his right hand.

Dr. Mehta testified as follows in his affidavit:

> Currently, I am a third-year plastic surgery resident with the University of Texas Medical Branch (UTMB) in Galveston, Texas. I have been a resident with UTMB since July 2006.  I understand that I have been named as a defendant in a civil lawsuit filed by David Wayne Shaw, an inmate confined to the custody of the Texas Department of Criminal Justice (TDCJ).  He alleges that I failed to schedule him for surgery following a telemed conference on August 22, 2007.

> On August 22, 2007, I was assigned to conduct telemed conferences (which are, in essence, examinations conducted via video) in

36

UTMB's TDCJ Orthopedic Surgery Clinic.  David Shaw was one of the patients that I evaluated that day.  My clinic note from that examination reveals that Mr. Shaw was a 39-year-old man, who was right-hand dominant, and he had a suspected fracture in his right fifth (5th) metacarpal.  I had no x-rays available to review during the examination.  Based upon the limitations of a telemed conference, I was unable to physically examine Mr. Shaw's right hand.

However, I was able to have him conduct range-of-motion tests, and I noted that the 5th digit on his right hand had some scissoring and inward rotation.  "Scissoring" means that, when Mr. Shaw made a fist with his right hand, his pinky finger went slightly underneath his ring finger.  Based upon my observations, I recommended that Mr. Shaw be called or scheduled for surgery.

That same day, after examining Mr. Shaw and other TDCJ Orthopedic Surgery Clinic patients, I gave a list of the patients that I examined, noting their diagnoses and recommended treatments, to the Chief Resident of TDCJ Orthopedic Surgery Service.  Since I was not permanently assigned to Orthopedic Surgery Services (I was only doing a one-month rotation in that section), I was not responsible for scheduling future Orthopedic Surgery appointments.

It should be noted that Mr. Shaw sustained his hand injury on March 2, 2007.  The telemed conference that I had with him occurred over five months later, on August 22, 2007.  Any fracture Mr. Shaw may have sustained on March 2, 2007 would have healed within six weeks.  So, by the time that I evaluated Mr. Shaw, his finger had healed and any surgery recommended was not emergent, but rather was purely elective.  His fracture was not a serious medical condition that warranted or required emergent medical attention.

In fact, a review of Mr. Shaw's medical records reveals that, on November 29, 2007, he was again examined by TDCJ Orthopedic Surgery Service via telemed conference.  During that examination, the physician noted that Mr. Shaw had good range of motion in his right hand, even though he experienced some overlap of his 5th metacarpal when he clenched his right fist.  The physician noted that Mr. Shaw's right 5th metacarpal fracture had healed.  No treatment was necessary, and no special needs were indicated.

(Docket Entry No. 175, Dr. Mehta's Motion for Summary Judgment, Appendix A, pp. 1-2).

37

The Assistant Program Director for UTMB's Training of Residents, Dr. Bauer, also provided an affidavit.  Dr. Bauer stated as follows:

> Mr. Shaw alleges that a Boxer's fracture that he received as a result of a fist fight on March 2, 2007 has not been appropriately cared for by numerous medical providers.  He also complains that he was not properly scheduled for surgery following a telemed conference with Dr. Ankur Mehta on August 22, 2007.  He contends that Dr. Mehta's failure to properly schedule him for surgery amounts to deliberate indifference because Dr. Mehta was aware that he had a serious medical need, which he failed to treat.

> On March 2, 2007, Mr. Shaw injured his right hand in a fist fight with another inmate.  An x-ray taken of Mr. Shaw's right hand on March 8, 2007, indicates that he had a Boxer's fracture in his right 5th metacarpal.  Bone fractures typically heal within four to six weeks. Therefore, Plaintiff s hand had healed on or near the middle of April 2007.  Mr. Shaw's follow-up x-ray, which was taken on June 12, 2007, reveals that his right hand fracture had healed, and there were no acute bone abnormalities.

> On August 22, 2007, when Dr. Mehta examined Mr. Shaw via telemed conference, Mr. Shaw did not have a serious medical condition.  In fact, since his hand had healed, there was no acute or emergent problem to be addressed.

> Dr. Mehta's recommendation that Mr. Shaw be considered or called for surgery was not an emergent treatment recommendation.  It was a recommendation that Mr. Shaw's condition be further evaluated to determine the benefits, if any, of surgery.

> As Mr. Shaw's records reveal, surgery was not necessary.  His right hand fracture has healed, and he continues to receive over-the-counter pain medications to alleviate his subjective complaints of pain.

(Docket Entry No. 175, Dr. Mehta's Motion for Summary Judgment, Appendix F, pp. 2-3).

The medical records show that Dr. Mehta examined Shaw via a telemed conference in August 2007.  At the time, Dr. Mehta did not have access to the x-rays of Shaw's hand.  Based on his observations of Shaw's hand, Dr. Mehta believed that surgery should be scheduled, which meant

that Shaw should be evaluated to determine if surgery was in fact required.  Dr. Mehta was on a month-long rotation in the orthopedic department and not responsible for scheduling surgeries or related examinations.  When Dr. Mehta examined Shaw in August 2007, the hand injury had healed and no emergency was present.  Subsequent evaluation of Shaw's hand confirmed that the hand had healed and no surgery or treatment was needed.

The record shows no basis to infer that Dr. Mehta delayed providing or denied medical treatment to Shaw because of deliberate indifference to his serious medical needs.  Dr. Mehta is entitled to judgment as a matter of law.

### (12)    Sergeant Franshaw, Correctional Officer

Shaw alleges that after he hurt his hand by striking another inmate, Sergeant Franshaw escorted him to the infirmary.  The nurse on duty was dispensing insulin and could not promptly attend to Shaw.  According to Shaw, Sergeant Franshaw refused to wait and instead escorted Shaw to his prehearing detention cell without any medical examination.  (Docket Entry No. 1, Complaint, p. 7).

Shaw alleges that Sergeant Franshaw violated TDCJ policy.  The Correctional Managed Health Care (CMHC) Policy E-39.1 "Health Evaluation and Documentation - Offenders in Segregation" provides that:

> an offender who is determined by security staff to require placement into pre-hearing detention or security detention, and who has no apparent medical or mental health problems (e.g., bleeding, contusion, vomiting, diminished consciousness, disorientation), may be placed in pre-hearing detention or security detention without prior health evaluation.  An offender placed in segregation in these situations must have a health evaluation by a licensed health care provider (physician, mid-level provider, or nurse) completed as soon as possible and documented on the HSM-14 or the appropriate electronic counterpart no later than 12 hours after his or her placement in segregation.

(Docket Entry No. 176, Smith's Motion for Summary Judgment, Ex. F, p. 149).

The record shows that Sergeant Franshaw escorted Shaw to the infirmary.  At that point, the medical personnel were responsible for complying with CMHC Policy E-39.1.  Even if Sergeant Franshaw did not wait for an examination, the policy did not require him to do so if there was no emergency medical situation.  Even assuming that Sergeant Franshaw did not follow the prison policy, this does not give rise to a constitutional violation.  The record does not show that Sergeant Franshaw was deliberately indifferent to Shaw's serious medical need for an examination by the nurse at that time.  The summary judgment evidence shows that Shaw was examined by medical personnel at the infirmary and from the side of his cell the following morning.  (Docket Entry No. 176, Smith's Motion for Summary Judgment, Ex. E, pp. 112-115).

### (13)    Conclusion as to the Medical Care Claim

Shaw has failed to raise a fact issue that any of the UTMB Defendants or Sergeant Franshaw were deliberately indifferent to his serious medical needs by denying him treatment for his fractured hand.  The summary judgment evidence shows that Shaw was seen by medical personnel the day after he was injured.  Medical personnel took x-rays on March 8, 2007 and determined that the hand was fractured.  Based on the alignment of the bones, medical personnel determined that it was not necessary to place the hand in a splint.  Evaluation of the hand continued.  It was determined that no surgery was required.

Dr. Julye testified that there is no consensus on the best way to treat such a fracture and that they often do not require surgery.  (Docket Entry No. 174, Williams's Motion for Summary Judgment, Ex. I, pp. 3-4).  Other medical personnel have testified similarly.  (Docket Entry No. 175, Dr. Mehta's Motion for Summary Judgment, Appendix A, pp. 1-2; Docket Entry No. 175, Dr. Mehta's Motion for Summary Judgment, Appendix F, pp. 2-3).  Fractures such as that in this case

40

do not often require surgery.  Shaw was seen repeatedly, relieved from work, and given medication for pain relief.  Shaw's belief that he should have received a splint or surgery is a disagreement over the treatment that medical professionals provided.  Such a disagreement does not amount to a constitutional violation.  Complaints that more treatment should have been ordered, without more, are insufficient to show deliberate indifference because "the decision whether to provide additional treatment is a classic example of a matter for medical judgment." *Domino*, 239 F.3d at 756 (internal quotation omitted). Nor does "an official's failure to alleviate a significant risk that he should have perceived but did not"; such a failure, "while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 837-38*; see also Lawson v. Dallas County*, 286 F.3d 257, 262-63 (5th Cir. 2002) (holding that "[d]eliberate indifference cannot be inferred from a prison official's mere failure to act reasonably, i.e., it cannot be inferred from negligence alone").

Shaw has failed to rebut the defendants' affirmative defense of qualified immunity by showing the existence of a disputed fact issue material to determining whether the defendants were deliberately indifferent to his serious medical needs.  *See Pierce v. Smith,* 117 F.3d 866, 871-72 (5th Cir. 1997).  The defendants' motion for summary judgment as to Shaw's claim of deliberate indifference to his serious medical needs is granted.

## C.  The Claim Based on Inadequate Grievance Procedures

Shaw alleges that his due process rights were violated by the prison's grievance procedures.  Shaw filed several grievances after the March 2, 2007 fight.  He alleges that defendants Smith, Ward, James, Hollingsworth and Johnson acted with deliberate indifference by either failing properly to investigate or by denying these grievances. (Docket Entry No. 46, Amended Complaint, pp. 6-8).

Shaw's due process claim fails.  "A prisoner has a liberty interest only in freedoms from restraint imposing atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Geiger v. Jowers*, 404 F.3d 371, 373-74 (5th Cir. 2005) (internal citation and quotation omitted).  An inmate does not have a constitutionally protected liberty interest in having grievances resolved to his satisfaction.  There is no due process violation when prison officials fail to do so. *Geiger v. Jowers,* 404 F.3d 371, 373-74 (5th Cir. 2005); *see also Edmond v. Martin, et al.,* slip op. no. 95-60666 (5th Cir., Oct. 2, 1996) (unpublished) (prisoner's claim that a defendant "failed to investigate and denied his grievance" raises no constitutional issue); *Thomas v. Lensing, et al.,* slip op. no. 01-30658 (5th Cir., Dec. 11, 2001) (unpublished) (same).  Because Shaw has no liberty interest in the resolution of his grievances, the defendants' alleged failure to address the grievances did not violate a constitutional right.

Alternatively, the record shows that the defendants did not violate Shaw's right to due process in responding to his grievances.  The Offender Grievance Operations Manual outlines the TDCJ policies and procedures for the offender grievance process. (Docket Entry No. 176, Smith's Motion for Summary Judgment, Ex. D).  The Grievance Manual explains that offenders should first try informally to resolve their problems before using the grievance system. (Exhibit D, p. 108).  A nonemergency medical grievance about the quality of care or treatment is processed as a Specialty Grievance.  (*Id.* at 110).  Such grievances are forwarded to the Manager of Health Services at the unit.  The medical department responds to the grievance.  (*Id.*).  If the response is not acceptable, the Unit Grievance Investigator (UGI) coordinates with the Unit Manager of Health Services to investigate further.  (*Id.*).

Each of Shaw's claims against the various grievance officials is addressed below.

> **(1)** **Kelli Ward, Assistant Administrator, Offender Grievance; Trish Hollingsworth, Unit Grievance Investigator; and Alice James, Administrative Assistant, Grievance**

On April 11, 2007, Shaw filed a Step 1 Grievance, Number 2007130736, complaining that he had not been examined by a nurse on March 2, the day of the fight, because Sergeant Franshaw was unwilling to wait until the nurse had time to do so. Shaw also stated that he did not have a pre-hearing detention physical before being locked up, although he reported that his hand was x-rayed. He complained that repeated requests for attention were being denied. (Docket Entry No. 176, Smith's Motion for Summary Judgment, Ex. C, pp. 36-37).

On May 18, 2007, Hollingsworth completed a grievance worksheet as part of her review of Shaw's Step 1 Grievance, Number 2007130736. (*Id.* at 41). On May 21, 2007, Assistant Warden Thomas responded to Shaw's grievance. The response stated that Shaw had been seen by medical professionals on March 3 and 8 and his prescription had been renewed on April 27. Shaw was further advised that if he was still experiencing medical problems, to contact the medical department. (*Id.* at 37).

On May 28, 2007, Shaw filed a Step 2 Grievance, Number 2007130736. He complained that he needed medical attention and the response to his Step 1 grievance was inadequate. (*Id.* at 38-39). On June 20, 2007, James completed a health services grievance worksheet as well as a grievance investigation worksheet as part of her investigation of Shaw's Step 2 Grievance, Number 2007130736. (*Id.* at 52, 71). On August 8, 2007, Kelli Ward, Assistant Administrator, Offender Grievance, sent Shaw a response to the Step 2 Grievance. Ward told Shaw that his complaint about the staff had been referred to the Region 1 Grievance Office for investigation. That office had investigated and determined that the staff had not denied Shaw medical attention. Ward noted that the clinic notes showed that Shaw had been evaluated according to TDCJ policy and that no

corrective action was warranted.  Ward told Shaw that his complaint about medical treatment had been referred to the Office of Professional Standards, which had investigated.  Shaw had complained that he was denied a prehearing detention physical and was not seen after the March 2 fight.  Ward noted that a prehearing detention physical was done on March 3 and that on the same day, Shaw was also seen cell-side.  Ward noted that Shaw's hand had been x-rayed and that no splint was needed. Ward informed Shaw he was scheduled for an orthopedic evaluation in July 2007.  Ward referred Shaw's complaint about the lack of a prehearing detention physical to Diane Box, the Huntsville District Practice Manager, for further review.  (Docket Entry No. 176, Smith's Motion for Summary Judgment, Ex. C, p. 40).

In sum, the record shows that defendants Ward, Hollingsworth, and James conducted an investigation in response to Shaw's grievances, including reviewing clinical records.  These defendants determined that though Shaw may not have received a prehearing detention physical before being placed in segregation on March 2, he was examined on March 3 and received extensive subsequent treatment by the medical department.  (*Id.* at 40-71).  Ward, Hollingsworth, and James referred Shaw's complaints about the medical treatment they received to the Office of Professional Standards.  Nothing in the summary judgment evidence shows that these defendants ignored a substantial risk of serious harm to Shaw's serious medical needs.  Instead, these defendants took steps to resolve Shaw's complaints.  Ward, Hollingsworth, and James are entitled to judgment as a matter of law.

### (2)  **Sharon Johnson**, **Ellis Unit Grievance Department**

On July 27, Shaw filed another Step 1 Grievance, complaining of numbness and pain in his hand, and a lack of response to his medical sick call requests.  (Docket Entry No. 176, Smith's Motion for Summary Judgment, Ex. C, pp. 72-73).  Johnson responded, stating that Shaw's

44

complaint had been forwarded to the medical department for investigation and response and reminding him that the grievance office defers to the medical department's judgment on how to handle medical issues. (*Id*. at 73). Johnson urged Shaw to file a sick call request and told him that he was scheduled for the Chronic Care Clinic. (*Id.).*

Nothing in the summary judgment evidence shows that Johnson ignored Shaw's complaints. Instead, Johnson reviewed Shaw's medical records, responded to his grievances, and took steps to resolve Shaw's complaints. Johnson is entitled to judgment as a matter of law.

### (3)    Guy Smith, TDCJ Office of Professional Standards

On October 26, 2007, Shaw filed a Step 2 Grievance, Number 2007196411. Shaw alleged that Johnson's response to his Step 1 Grievance was insufficient. Shaw reiterated his complaint that his numerous medical requests were unanswered. (Docket Entry No. 176, Smith's Motion for Summary Judgment, Ex. C, pp. 74-75). Guy Smith investigated and prepared a list of issues to address. On November 15, 2007, Smith wrote to Denise Box, the Huntsville District Practice Manager for UTMB Correctional Managed Health Care, stating that a review of the medical records showed that a qualified health care professional had failed to see Shaw in response to several sick call requests submitted between April 23 and August 3, 2007. Smith asked whether this was consistent with Correctional Managed Health Care (CMHC) Policy E-38.1 (Rev. 01/04), which states: "Non-emergency requests should be triaged within 24 hours of receipt of the sick call request in the health care services department and the offender seen at sick call by a qualified health professional within the next 24 hours (72 hours on the weekend)." Smith raised the following questions:

> 1. Why did a qualified health care professional fail to see Offender
> Shaw in response to his submitted Sick Call Requests?

2. What process is in place to have a health care professional see an offender in accordance with Correctional Managed Health Care policy E-38.1?

3. Why didn't the nurse triaging these Sick Call Requests, see this offender?

4. What process is in place to ensure that qualified health care professionals see offenders in a timely manner?

5. How was the severity of Offender Shaw's hand condition established, to determine his need for medication renewals and/or treatment, without seeing the patient?

(Docket Entry No. 176, Smith's Motion for Summary Judgment, Ex. F, p. 116).

On December 4, 2007, Shanta Crawford, Practice Manager, responded to Smith, stating as follows:

> According to Ellis Facility process an offender patient must be seen by a qualified health professional in sick call if he is complaining of clinical signs or symptoms in the Sick Call Request, or is requesting to be seen. This physical evaluation must occur within 48hrs of receipt of the SCR (72 hours on weekends). In the case of Offender Reeves [sic] staff failed to triage sick call properly, see the patient, and follow up on the specialty clinic referral. Staff will be re-educated in regards to policy 38.1 at the monthly staff meeting to prevent these types of issues from reoccurring in the future. It is the goal of the medical management team to provide quality medical care to the offender population.

(Docket Entry No. 176, Smith's Motion for Summary Judgment, Ex. F, pp. 118-19).

On November 15, 2007, Smith also wrote to Mike Hill, Administrator, UTMB Correctional Managed Health Care. Smith noted that "Shaw was seen by VCL orthopedic hand on 8-22-07 and surgery was recommended. This surgery was never scheduled. An 11-29-07 appointment has been secured by the grievance investigator, for Offender Shaw to be evaluated by Hospital Galveston orthopedic hand regarding his current need for surgery." Smith asked: "1. Why wasn't this Offender

46

scheduled for surgery as recommended by the specialist? 2. What process is in place to ensure appointments are scheduled?" (Docket Entry No. 176, Smith's Motion for Summary Judgment, Ex. F, p. 120).

On December 3, 2007, Andrew DeYoung, Administrator, Hospital Galveston, responded to Smith's questions:

> I have investigated this incident and discovered that our Plastic Surgery resident (Dr. Mehta) did not know he was supposed to schedule the surgery following the telemedicine visit on 22 August, 2007. This is not the norm and should not occur again. After telemedicine clinic, physicians are supposed to notify the telemed schedulers of the desired surgery date so that our scheduling office can book it. We apologize for this misunderstanding.

(Docket Entry No. 176, Smith's Motion for Summary Judgment, Ex. F, p. 121). Smith advised Shaw that his complaint of a lack of medical response to his sick call requests had been forwarded to the UTMB for further review, and that the delay in his surgery being scheduled was being forwarded to the appropriate entity, UTMB Hospital Galveston.

The record shows that Smith was not deliberately indifferent to Shaw's complaints. To the contrary, Smith actively took steps to investigate the response to Shaw's requests for treatment. Smith is entitled to judgment as a matter of law.

### D.    The Conspiracy Claim

Shaw asserts that prison officials engaged in a conspiracy to deny medical care. The elements of civil conspiracy are a violation of a right protected under federal law and actions taken in concert by the defendants with the specific intent to violate that right. *Cinel v. Connick,* 15 F.3d 1338, 1343 (5th Cir.), *cert. denied,* 513 U.S. 868 (1994). A plaintiff who asserts a conspiracy claim under the civil rights statutes must plead the "operative facts" showing an illegal agreement; "bald allegations" of an agreement do not suffice. *Lynch v. Cannatella*, 810 F.2d 1363, 1369-70 (5th Cir.

47

1987);  *Arsenaux v. Roberts*, 726 F.2d 1022, 1023-24 (5th Cir. 1982).  The plaintiff may, and often must, rely on circumstantial evidence, because conspiracies "are rarely evidenced by explicit agreements."  *Mack v. Newton*, 737 F.2d 1343, 1350-51 (5th Cir. 1984) (quoting *Michelman v. Clark-Schwebel Fiber Glass Corp*., 534 F.2d 1036, 1043 (2d Cir. 1976)).

Shaw claims that prison officials denied him medical care for his broken hand and conspired to cover up the incident.  The extensive medical records show that Shaw received frequent medical attention for his broken hand as well as his other medical problems.  In response to Shaw's complaints that he was not seen earlier or more often, did not receive a splint, and did not have surgery, grievance and medical officials investigated.  TDCJ administrators acknowledge that prison officials had not complied with certain prison regulations requiring a more prompt response to some of Shaw's requests for medical attention.  Far from a "cover-up," the TDCJ officials uncovered and addressed an apparent failure to follow certain prison regulations.  The record defeats a claim that medical or TDCJ personnel falsified Shaw's medical records, as he alleges.  *See, e.g., Knox v. Wainscott*, — F. Supp.2d ---- (N.D. Ill. 2003) (available on WESTLAW at 2003 WL 21148973) (no section 1983 claim against nurse who allegedly falsified injury report; even if the nurse engaged in professional misconduct, no constitutional violation was shown); *cf. Johnson v. Rodriguez,* 110 F.3d at 308-09 and n.13 (because Texas prisoners have no protected liberty interest in parole, they cannot raise a federal constitutional challenge to state parole review decisions on the basis that they are made based on false or unreliable information).

"It remains necessary to prove an actual deprivation of a constitutional right; a conspiracy to deprive is insufficient." *Gillum v. City of Kerrville,* 3 F.3d 117, 123 (5th Cir. 1993)(quoting *Villanueva v. McInnis,* 723 F.2d 414, 418 (5th Cir. 1984)).  Shaw's conspiracy allegations fail because he has failed to raise a fact issue as to whether false information was placed in his file or

whether it constituted a federal constitutional violation. The defendants are entitled to summary judgment on the conspiracy claim.

### E.    The Claim Based on Violation of Prison Regulations

Shaw also alleges that several defendants violated his rights because they failed to follow TDCJ-CID procedures on providing a prehearing detention medical examination and on the time for responding to sick call requests. Failure to follow such procedures does not amount to a constitutional violation. *See Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996) (per curiam) (TDCJ-CID's failure to follow its own administrative rules and regulations does not raise federal constitutional issues as long as minimal constitutional requirements are met). Shaw's claim that the defendants violated his constitutional rights because they failed to follow certain prison rules or policies lacks merit.

### F.    The Claims Against Supervisory Defendants Based on the Acts of Their Employees

Shaw claims that defendants Janicek, Warden of the Ellis Unit, and Thomas, Assistant Warden at the Ellis Unit, were deliberately indifferent for failing to supervise officers and medical staff under their authority. (Docket Entry No. 1, Complaint, p. 18). Shaw alleges that Lieutenant Allee was responsible for supervising his subordinate, Sergeant Franshaw. (Docket Entry No. 46, Amended Complaint, p. 10). Shaw complains that Dr. Williams failed properly to manage and train the medical personnel under her authority and supervision. (Docket Entry No. 7, Plaintiff's More Definite Statement, p. 4). Shaw alleges that Shanta Crawford, the Health Care Administrator over the Ellis I Unit's medical department, is liable because she was responsible for training medical personnel at the Unit.

Individual liability under § 1983 may not be based on a supervisor's vicarious liability for the acts or omissions of the employees they supervise. *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 534 (5th Cir. 1997). Supervisory officials may be liable if their own action or inaction, performed with a certain degree of gross negligence or deliberate indifference, proximately causes a constitutional violation. *Thompson v. Upshur County, Texas*, 245 F.3d 447, 459 (5th Cir. 2001). To establish liability for these prison officials, Shaw would have to show either (1) personal involvement in the alleged wrongful acts or (2) that these defendants implemented a policy that resulted in deprivation of Shaw's constitutional rights. *See Cronn v. Buffington*, 150 F.3d 538, 544 (5th Cir. 1998); *Alton v. Texas A & M Univ.*, 168 F.3d 196, 200 (5th Cir. 1999); *Thompkins,* 828 F.2d at 304. To prevail against a supervisory official, the plaintiff must demonstrate that the official's act, or failure to act, either caused or was the moving force behind the constitutional violation. *Smith v. Brenoettsy,* 158 F.3d 908, 911 (5th Cir. 1998). The supervisor's conduct must be measured against the standard of deliberate indifference. *Alton*, 168 F.3d at 200.

Shaw has not alleged or offered any summary judgment evidence suggesting that Janicek, Thomas, Allee, Dr. Williams, or Crawford were personally involved in denying him medical care or delaying in providing him care. Rather, Shaw claims that these defendants maintained an unconstitutional policy of failing to ensure that their subordinates provided proper medical care. Shaw has not established that these defendants implemented a constitutionally deficient policy or that the policy was the moving force in a denial of his constitutional rights. *Cronn,* 150 F.3d at 544. The claims against Janicek, Thomas, Allee, and Dr. Williams are dismissed.

## V.     The Claims Against the Defendants in Their Official Capacities

Suits for damages against the state are barred by the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Absent waiver, neither a state nor agencies acting under its

control are subject to suit in federal court. *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf &*

*Eddy, Inc.*, 506 U.S. 139, 144 (1993). This bar remains in effect when state officials are sued for

damages in their official capacity. *Cory v. White*, 457 U.S. 85, 90 (1982). Shaw sues the defendants

for damages in their official capacities. Those claims are barred by the Eleventh Amendment.

Shaw also names UTMB as a defendant. (Docket Entry No. 7, Plaintiff's More Definite

Statement, p. 2). Unless expressly waived, the Eleventh Amendment bars an action in federal court

by, *inter alia*, a citizen of a state against his or her own state, including a state agency. *See Martinez*

*v. Texas Dep't of Criminal Justice*, 300 F.3d 567, 574 (5th Cir. 2002). As an instrumentality of the

state, UTMB is immune from a suit for money damages under the Eleventh Amendment. *See Talib*

*v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998).

The Eleventh Amendment does not bar Shaw's claim for prospective relief. Because the real

party in interest in an official-capacity suit is the governmental entity and not the named official, the

entity's "policy or custom" must have played a part in the violation of federal law. *Hafer v. Melo*,

502 U.S. 21, 25 (1991)(quoting *Monell v. Dept. of Social Servs. of New York*, 436 U.S. 658, 694

(1978)). When Shaw filed this lawsuit, he was confined at the Ellis Unit, where the alleged violation

of his civil rights took place. (Docket Entry No. 1, Complaint, p. 27). In December 2008, he was

transferred to the Stiles Unit in Beaumont, Texas. (Docket Entry No. 113). Shaw has neither

alleged nor demonstrated that there is a reasonable likelihood that he will be transferred back to the

Ellis Unit. Shaw's transfer from the Ellis Unit makes his claims for injunctive relief moot. *See*

*Oliver v. Scott,* 276 F.3d 736, 741 (5th Cir. 2002) (quoting *Murphy v. Hunt,* 455 U.S. 478, 482

(1982)); *Wallace v. Texas Tech University,* 80 F.3d 1042, 1047 n.3 (5th Cir. 1996) (noting that

"[j]urisdiction over a plaintiff's claims for future relief is appropriate only if a reasonable likelihood

exists that the plaintiff will again be subjected to the allegedly unconstitutional actions"); *Herman*

*v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (finding that an inmate's transfer from a detention center to a state correctional institution mooted his Eighth Amendment claims for declaratory and injunctive relief because any suggestion of a transfer back to the detention center was too speculative to warrant relief). Shaw's claims for injunctive relief are dismissed as moot.

In addition, Shaw has not demonstrated that a TDCJ-CID policy caused a violation of his constitutional rights. The defendants are entitled to judgment as a matter of law on the claim for injunctive relief.

## VI.    The Claims Against the Remaining Defendants

Shaw has also sued Wendy McKee, William Mills, and Cheryl Loeffler. These defendants were served but have not appeared. The summary judgment motions filed by the UTMB Defendants, the TDCJ Defendants, and Dr. Mehta dispose of all the claims Shaw has presented. Because all the other, similarly situated defendants have established that Shaw has no basis for his claims, Shaw cannot recover against the other, similarly situated, defendants. *See Lewis v. Lynn*, 236 F.3d 766, 768 (5th Cir. 2001) (quoting *United States v. Peerless Ins. Co.*, 374 F.2d 942, 945 (4th Cir. 1967) (citations omitted)). Shaw's claims against Wendy McKee, William Mills, and Cheryl Loeffler lack merit and are dismissed with prejudice. 28 U.S.C. § 1915(e)(2)(B).

## VII.   Conclusion

The motion for summary judgment filed by Betty J. Williams, William Shelby, Brenda Hough, Sandra Dickey, Victoria Ray, Kerri Paradysz, Denise Box, Shanta Crawford, Anitra Manas, and Andrew DeYoung, (Docket Entry No. 174), is granted. The motion for summary judgment filed by Guy Smith, Kelli Ward, Alice James, Trisha Hollingsworth, Stephen Allee, Richard Thomas, Sharon Johnson, David Franshaw, and Alfred Janicek, (Docket Entry No. 176), is granted. Dr.

Mehta's motion for summary judgment, (Docket Entry No. 175), and motion to supplement his motion for summary judgment, (Docket Entry No. 177), are granted.

Shaw's claims against Wendy McKee, William Mills, Cheryl Loeffler, and UTMB lack merit and are dismissed with prejudice under 28 U.S.C. § 1915(e)(2)(B) as without an arguable basis in law.

Shaw's motion to compel, (Docket Entry No. 192), is denied as moot.  Shaw's motion for leave to file objections to the defendants' motions for summary judgment, (Docket Entry No. 193), is granted *nunc pro tunc.*

The Clerk will provide a copy of this order by regular mail, facsimile transmission, or e-mail to the parties and to the TDCJ - Office of the General Counsel, Capitol Station, P.O. Box 13084, Austin, Texas, 78711, Fax: 512-936-2159.

SIGNED on March 22, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge